Anthony Barnes (Bar No. 199048)
Jason Flanders (Bar No. 238007)
AQUA TERRA AERIS LAW GROUP LLP
828 San Pablo Ave., Ste. 115B
Albany, CA 94706
Phone: (415) 326-3173
Email: amb@atalawgroup.com

*Attorneys for Plaintiff*
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>        Plaintiff,<br><br>    v.<br><br>COVEY AUTO EXPRESS INC., a California corporation,<br><br>        Defendant. | Civil Case No.:<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*)** |

California Sportfishing Protection Alliance ("CSPA" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

2.      On January 11, 2018, CSPA issued a 60-day notice letter ("Notice Letter") to Covey Auto Express, Inc., Doing Business As Pacific Auto Transport. (Covey Auto Express, Inc., is referred to herein as "Defendant".) The Notice Letter was specifically issued to President and General Operations Manager Mike Covey Jr., and Charles Hastings the Agent for Service of Process for Defendant. The Notice Letter informed Defendant of its violations of California's General Permit for Discharges of Storm Water Associated with Industrial Activities (*National Pollutant Discharge Elimination System (NPDES) General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ*) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, hereinafter referred to as the "Storm Water Permit") and the Clean Water Act at the Covey Auto Express, Inc., Doing Business As Pacific Auto Transport facility (the "Covey Auto Facility") located at 1444 El Pinal Drive Stockton, CA 95205. The Notice Letter informed Defendant of CSPA's intent to file suit against Defendant to enforce the Storm Water Permit and the Clean Water Act.

3.      The Notice Letter was sent to the Owner and Manager of the Covey Auto Facility as the owners and operators of the Covey Auto Facility, as required by 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, North Coast Region, ("Regional Board") as required by Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter is attached hereto as **Exhibit A** and is incorporated herein by

reference.

4.     More than sixty (60) days have passed since the Notice Letter was served on the Defendant and the State and Federal agencies. CSPA is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA, 33 U.S.C. § 1319(g).

5.     Venue is proper in the Eastern District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

6.     Plaintiff also seeks relief from Defendant's violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

## II.     INTRODUCTION

7.     With every rainfall event, hundreds of millions of gallons of polluted rainwater, originating from industrial operations such as the Covey Auto Facility, pour into the storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering marine and river environments each year. These surface waters, known as Receiving Waters, are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied fisheries, these waters are still essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species. Stormwater and non-stormwater contain sediment, heavy metals, such as aluminum, iron, chromium, copper, lead, mercury, nickel, and zinc, as well as, high concentrations of nitrate plus nitrite as nitrogen, and other pollutants. Exposure to polluted stormwater harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in stormwater and non-stormwater discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

8.      High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS has been shown to alter predator-prey relationships (for example, turbid water may make it difficult for fish to hunt prey). Deposited solids alter fish habitat, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS. Thus, higher concentrations of TSS result in higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

9.      Storm containing high levels of chemical oxygen demand ("COD") directly affects the amount of dissolved oxygen in rivers and streams. The greater the COD, the more rapidly oxygen is depleted in the stream. This means less oxygen is available to higher forms of aquatic life. The consequences of high COD are the same as those for low dissolved oxygen: aquatic organisms become stressed, can suffocate, and may die.

10.     This complaint seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendant's substantive and procedural violations of the Storm Water Permit and the Clean Water Act resulting from Defendant's operations at the Covey Auto Facility.[1]

11.     CSPA specifically alleges violations regarding Defendant discharge of pollutants from the Covey Auto Facility into waters of the United States; violations of the filing, monitoring and reporting, and best management practice requirements; and violations of other procedural and substantive requirements of the Storm Water Permit and the Clean Water Act, are ongoing and continuous.

III.    **PARTIES**

A.    **California Sportfishing Protection Alliance**

12.     Plaintiff CSPA is a California non-profit public benefit conservation and research

---

[1] The Covey Facility is fully described in Section V below.

Complaint for Declaratory and Injunctive Relief      4
and Civil Penalties

organization with its principal place of business in Stockton, California. CSPA's organizational purpose is the protection, preservation, and enhancement of fisheries and associated aquatic and riparian ecosystems of California's waterways, including the San Joaquin River, Yosemite Lake and the Smith Canal, the Receiving Waters herein. This mission is implemented through active participation in water rights and water quality processes, education and organization of the fishing community, restoration efforts, and vigorous enforcement of environmental laws enacted to protect fisheries, habitat and water quality. Members of CSPA use and enjoy California's numerous rivers, creeks and waterways for recreation and other activities, including, the San Joaquin River, Yosemite Lake and the Smith Canal where they view and enjoy wildlife, boating, fishing, birdwatching, and to engage in scientific study, among other things. CSPA's members derive significant and ongoing use and enjoyment from the aesthetic, recreational, and conservation benefits of the San Joaquin River watershed.

13.     CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including Stockton and the San Joaquin River watershed. CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California. To further these goals, CSPA actively seeks federal and state agency implementation of the Clean Water Act and other laws and, where necessary, directly initiates citizen enforcement. As referenced in Paragraph 12, members of CSPA use and enjoy the Receiving Waters herein into which Defendant have caused, are causing, and will continue to cause, pollutants to be discharged. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendant's ongoing failure to comply with the Clean Water Act and/or the Storm Water Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

14.     Defendant's failure to comply with the procedural and substantive requirements of the Storm Water Permit and/or the Clean Water Act, including but not limited to Defendant's discharge of polluted stormwater and non-stormwater from the Covey Auto Facility, negatively impacts and impairs CSPA's members' use and enjoyment of these waters.

15. Continuing commission of the acts and omissions alleged herein will irreparably harm CSPA's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owners and Operators of the Covey Auto Facility**

16. CSPA is informed and believes, and thereon alleges, that Covey Auto Express Inc. is a corporation organized under the laws of California with a fictitious business name of Pacific Auto Transport.

17. CSPA is informed and believes, and thereon alleges, that Defendant's agent for service of process with the Office of the California Secretary of State is Charles Hastings at the address of 4568 Feather River Dr., Stockton CA 95219.

18. CSPA is informed and believes, and thereon alleges, that Covey Auto Express Inc., Michael Covey Jr., and Kathy Covey are the Owners/Operators of the Covey Auto Facility.

19. Collectively, CSPA refers to Covey Auto Express Inc., Michael Covey Jr., and Kathy Covey as "the Owners/Operators," defined herein as the Owners/Operators of the Covey Auto Facility.

**IV.    STATUTORY BACKGROUND**

**A.    The Clean Water Act**

20. Section 101(a) of the Clean Water Act, 33 U.S.C. § 1251(a) declares the goals and policy of the CWA, with the objective to restore and maintain chemical, physical, and biological integrity of the Nation's waters, and the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983. 33 U.S.C. § 1251(a)(2).

21. Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

22. Section 402(p) of the CWA establishes a framework for regulating municipal and industrial stormwater discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial stormwater discharges

through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial stormwater dischargers. 33 U.S.C. § 1342.

23.    Section 301(b) of the Clean Water Act requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

24.    The Clean Water Act requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

25.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

26.    The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

27.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

28.    "Navigable waters" means "the waters of the United States." 33 U.S.C. 1362(7).

29.    "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

30.    The EPA promulgated regulations for the Section 402 NPDES permit program defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce.

31.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributaries to traditionally navigable waters where the non-navigable water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

32.     A significant nexus is established if the "[receiving waters], either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

33.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

34.     Section 505(a)(1) and Section 505(f) of the Clean Water Act provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

35.     The Defendant is a "person[s]" within the meaning of Section 502(5) of the Clean Water Act, 33 U.S.C. § 1362(5).

36.     An action for injunctive relief is authorized under Section 505(a) of the CWA, 33 U.S.C. § 1365(a).

37.     Pursuant to sections 309(d) and 505 of the Clean Water Act, each separate violation of the CWA occurring before November 2, 2015 subjects the violator to a penalty of up to $37,500 per day; violations occurring after November 2, 2015 and assessed on or after August 1, 2016 subjects the violator to a penalty of up to $51,570 per day. See 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

38.     Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys' fees, experts' fees, and consultants' fees.

B. **California's Storm Water Permit**

39.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted stormwater. States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a statewide general NPDES permit applicable to all industrial stormwater dischargers. *See id.*

40.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the EPA has authorized California to issue NPDES permits, including general NPDES permits. California has designated the State Water Resources Control Board ("State Board") and the Regional Water Quality Control Boards to administer its NPDES program. *City of Rancho Cucamonga v. Regional Water Quality Control Bd.*, 135 Cal. App. 4th 1377, 1380-81 (2006). In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

41.     The Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the CWA, 33 U.S.C. §§ 1342(b), (p), and 40 C.F.R § 123.25. Violations of the Storm Water Permit are also violations of the CWA. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

42.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States. The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards. *See* 33 U.S.C. § 1313(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. §§ 122.44(D)(1).

43.     Under the applicable EPA regulations[2] all surface and ground waters of the State of California are considered to be suitable, or potentially suitable, for municipal or domestic water supply and should be so designated by the Regional Boards unless a strict use attainability analysis is performed based upon a structured scientific assessment of the factors affecting the attainment of uses specified in

_____

[2] https://www.epa.gov/sites/production/files/2014-11/documents/ca-amend-resolution-88-63.pdf

Section 101(a)(2) of the Clean Water Act (the so called "fishable/swimmable" uses). 40 CFR 131.10(a) and (g).

44.   The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the Storm Water Permit on or about November 19, 1991, modified the Storm Water Permit on or about September 17, 1992, and reissued the Storm Water Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

45.   On July 1, 2015, the 2015 Permit became effective, and was issued as NPDES No. CAS000001 (the same NPDES permit number as the 1997 Permit). 2015 Permit, Section I(A) (Finding 4). The 2015 Permit superseded the 1997 Permit except for enforcement purposes. *Id* at Section I(A) (Finding 6). The substantive requirements of the 2015 Permit are the same or more stringent than the requirements of 1997 Permit.

46.   In order to discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms or obtain and comply with an individual NPDES permit. 1997 Permit, p. II-V; 2015 Permit, Section I(A) (Findings 8, 12). Prior to beginning industrial operations, dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* 1997 Permit, Provision E(1), Finding 3; 2015 Permit, Section I(A) (Finding 17), Section II(B).

47.   The 2015 Permit provides for two types of permit coverage: (I) NOI and (2) NEC, or No Exposure Certification. *See*, e.g., Permit, Sections XVII, XIX.A; *see also* 2015 Permit Fact Sheet, pp. 5, 12, 14, 68-69; *see also* 2015 Permit, Attachment D and Appendix 2.

48.   The types of 2015 Permit coverage are mutually exclusive and apply on a facility-wide basis. (*See* EPA Guidance Manual for Conditional Exclusion from Storm Water Permitting Based On "No Exposure" of Industrial Activities to Storm Water ("Storm Water Guidance".); *see also* 2015 Permit Fact Sheet, p. 69 (citing EPA's Storm Water Guidance).)

49.   NEC coverage is available on a facility-wide basis only, not for individual drainage areas or discharge locations. Generally, if any exposed industrial materials or activities exist, or have a potential to exist, anywhere at a facility, NEC coverage is not applicable to the facility. If the Regional

Board determines that a facility does have exposure or the facility's storm water discharges have a reasonable potential to cause or contribute to an exceedance of applicable water quality objectives/standards, the Regional Board can deny NEC coverage. 2015 Permit, Appendix 2.

50.     To gain NEC coverage, the NEC Checklist must by strictly adhered to. The Discharger must evaluate the eleven major areas that storm water exposure may occur and must be able to certify that none of these major areas have potential for exposure. If the Discharger cannot certify that every one of the eleven major areas do not have exposure, a potential for exposure exists at the facility and the facility is not eligible for NEC coverage. The Discharger must obtain (or continue) NOI coverage under this General Permit if the facility is not eligible for NEC coverage. After obtaining NOI coverage, or during a period of NOI coverage, the Discharger may implement facility modifications to eliminate the potential for a discharge of storm water exposed to industrial activity, and then change their NOI coverage to NEC coverage by certifying the conditions of "No Exposure" are met. 2015 Permit Section XVII and Appendix 2.

51.     Federal and state statutes provide for severe penalties for Dischargers that submit false information on the PRDs. Dischargers shall certify and submit Permit Registration Documents via SMARTS for NEC coverage in accordance with the Certification Requirements in Section XXI.K of the 2015 Permit. 2015 Permit, Attachment D and Appendix 2.

52.     The stringent NEC requirements are specifically detailed in Section XVII and Attachment 2 of the 2015 Permit, and include but are not limited to, eliminating all exposure of Industrial Materials and Activates to any precipitation or runoff, with industrial activities defined to include all industrial material handling activities or equipment, machinery, raw materials, intermediate products, by-products, final products, and waste products, and Material Handling Activities defined to include the storage, loading and unloading, transportation, or conveyance of any industrial raw material, intermediate product, final product, or waste product. 2015 Permit, Attachment D and Appendix 2.

53.     CSPA is informed and believes, and thereon alleges, that industrial activities at the Covey Auto Facility remain ongoing and are not eligible for NEC coverage.

54.     Section XII.C. of the 2015 Permit sets out specific actions permittees are required to take in response to an exceedance of the 2015 Permit's Numeric Action Levels ("NALs") referred to as

Exceedance Response Actions ("ERAs"). An exceedance of an NAL is not a per se violation of the 2015 Permit, but failure to meet the ERA requirements is a 2015 Permit violation.

55. There are two ERA levels: Level 1 and Level 2. The Covey Auto Facility entered Level 2 following the 2016-2017 reporting year[3], submitting a Level 2 to the State Board dated January 3, 2018. A Discharger that does not fully comply with the Level 1 status and/or Level 2 status ERA requirements, when required by the terms of this General Permit, is in violation of the 2015 Permit. Section I(M) (Finding 63).

56. Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. *See* 2015 Permit, Section XII.C. By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and identify in the evaluation the corresponding Best Management Practices ("BMPs") in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the 2015 Permit. *See* Permit, Section XII.C. l.a.-c. Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. *See* 2015 Permit, Section XII.C.l.c. Based upon this Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via Storm Water Multiple Application Tracking System ("SMARTS," an online database for dischargers to electronically file their storm water permit documents) a Level 1 ERA report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See* 2015 Permit, Section XII.C.2.a.i.-ii. The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. 2015 Permit, Section XII.C.2.a.iii. A permittee's Level 1 status for a

---

[3] a reporting year runs from July 1 to June 30

parameter will return to baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sample subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See* 2015 Permit, Section XII.C.2.b.

57.     A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate an NAL exceedance for that same parameter while the discharger is in Level 1. *See* 2015 Permit, Section XII.D. Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2015 Permit, Section XII.D. Permittee's with Level 2 status are required to certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedance(s) occurred. *See* 2-15 Permit, Section XII.D.1.a. For each new Level 2 NAL exceedance, the Level 2 Action Plan must identify which of the demonstrations in subsection D.2.a through c the permittee has selected to perform. *See* 2015 Permit, Section XII.D.1.a. The Level 2 ERA Action Plan shall at a minimum address the drainage areas with corresponding Level 2 NAL exceedances. *See* 2015 Permit, Section XII.D.l.c.

58.     On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger with Level 2 status shall certify and submit a Level 2 ERA Technical Report prepared by a QISP that must adhere to series of requirements as detailed in Section XII.D.2.a.i through iii of the 2015 Permit.

59.     Dischargers with Level 2 status who submit an Industrial Activity BMPs Demonstration in accordance with subsection 2.a.i through iii and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four (4) subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). If future NAL exceedances occur for the same parameter(s), the Discharger's baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. These Dischargers shall update the Level 2 ERA Technical Report as required Section D.3.c of the 2015 Permit.

60.     Current contamination resulting from historic industrial practices at the facility represents

a condition of exposure to waters of the United State; therefore a facility with historic contamination is not eligible for NEC coverage. 2015 Permit, Attachment 2.

61. CSPA is informed and believes, and thereon alleges, that a discharger may not qualify for NEC coverage until the requirements of Level 2 status are met under the 2015 Permit.

62. Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i), 1365(f).

C. **The Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

63. The Storm Water Permit contains certain absolute prohibitions. The Storm Water Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. 1997 Permit, Discharge Prohibition A(1); 2015 Permit, Discharge Prohibition III(B).

64. Effluent Limitation (B)(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand ("BOD"), TSS, oil and grease ("O&G"), pH, and fecal coliform.

65. Discharge Prohibition (A)(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance.

66. Under the CWA and the Storm Water Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution. 33 U.S.C. § 1311(b); 1997 Permit, Effluent Limitation B(3); 2015 Permit, Effluent Limitation V(A). EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate

whether a permittee's BMPs achieve compliance with the BAT/BCT standards. *See* Final National Pollutant Discharge Elimination System (NPDES) General Permit for Storm Water Discharges From Industrial Activities ("Multi-Sector Permit"), 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008; Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

67.    The EPA established Parameter Benchmark Values for the following parameters, among others, are as follows: pH – 6.0 – 9.0 standard units "s.u."); TSS – 100 mg/L; Oil and Grease ("O&G") – 15 mg/L; lead ("Pb") – 0.069 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L; aluminum ("Al") – 0.75 mg/L; copper ("Cu") – 0.0123 mg/L; and zinc – 0.117 mg/L. The 2015 Permit contains Numeric Action Levels ("NALs") for these same parameters that generally mirror the Benchmark Values.

68.    The 2015 Permit includes NALs. 2015 Permit, Section I(M) (Finding 62). During the public commenting period, the State Board stated that "NALs are not designed or intended to function as numeric technology-based effluent limitations." State Board 2012 Draft Industrial General Permit Response to Comments, Response #6 to Comment #12; *see also* 2015 Permit Section I(M) (Finding 63).

69.    Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit stormwater discharges from adversely impacting human health or the environment.

70.    Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of the Storm Water Permit's Receiving Water Limitation.

71.    Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) of the 2015 Permit prohibit stormwater discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

72.    Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

73. The State of California regulates water quality through the State Board and the nine Regional Boards. Each Regional Board maintains a separate Water Quality Control Plan which contains WQS for water bodies within its geographic area.

74. The State Water Quality Control Board, Central Valley Region (Revised July 2016), has issued the Water Quality Control Plan for the Central Valley Region ("the Basin Plan") to establish water quality objectives, implementation plans for point and non-point source discharges, prohibitions, and to further statewide plans and policies. The Basin Plan provides water quality objectives and special limits for dissolved oxygen levels in stretches of the San Joaquin River. The Basin Plan also provides that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life." The Basin Plan sets forth water quality objectives for dissolved metals, including arsenic, zinc, copper, iron, and mercury. *Id.*, Table III-1. The Basin Plan also states that the waters shall not receive sediment, settleable materials, or suspended materials that cause nuisance or adversely affect the waters' beneficial uses. *Id.*

75. In addition to the de facto beneficial uses of swimming and fishing applicable to the Receiving Waters herein (*see* 40 CFR 131.10(a) and (g)), the Basin Plan also identifies present and potential beneficial uses for various hydrologic units leading to the Sacramento San Joaquin River Delta, with municipal and domestic supply, agricultural supply, warm and cold migration, contact and non-contact water recreation, cold and warm freshwater habitat, wildlife habitat, and warm and cold spawning among them. The Basin Plan further notes that beneficial uses vary throughout the Delta and will be evaluated on a case-by-case basis, and that surface waters with the beneficial uses of groundwater recharge, freshwater replenishment, and preservation of rare and endangered species have not been identified in this plan with surface waters of the Sacramento and San Joaquin River Basins falling within these beneficial use categories will be identified in the future as part of the continuous planning process.

76. Surface waters that cannot support the beneficial uses of those waters listed in the Basin Plan or deemed on a case-by-case basis would be designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2012 303(d) List of Impaired Water Bodies the Sacramento San Joaquin River Delta is listed for the following CWA 303(d) impairments: Cholrdane,

DDT, Dieldrin, Dioxin Compounds, Furan Compounds, Invasive Species, Mercury, PCBs, and Selenium.[4] Various stretches of the San Joaquin River are also listed as impaired on the 2012 303(d) List of Impaired Water Bodies. Thus, the receiving waters for pollution from the Covey Auto Facility are impaired, and the Defendant's illegal discharges of pollutants above the WQS contributes to the continued impairment of the beneficial uses in the watershed.

77.     In addition, EPA has promulgated WQS for toxic priority pollutants in all California water bodies ("California Toxics Rule" or "CTR"), which apply to the Receiving Waters, unless expressly superseded by the Basin Plan. 65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

78.     The CTR sets forth lower numeric limits for zinc and other pollutants; CTR criteria can be as low as 0.067 mg/L for zinc in freshwater surface waters with water hardness calculation of 50 mg/L.[5]

79.     The CTR includes further numeric criteria set to protect human health and the environment in the State of California. *See* Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008 (April 2000), available at: http://water.epa.gov/lawsregs/rulesregs/ctr/factsheet.cfm.

80.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the 1997 Permit and Section VI(A) of the 2015 Permit.

**D.     The Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

81.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit, Section A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality

---

[4] https://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml (last accessed on March 7, 2018.)
[5] The CTR numeric limits, or "criteria," are expressed as dissolved metal concentrations in the CTR, but the Storm Water Permit required permittees to report their sample results as total metal concentrations. *See* 1997 Permit § B(10)(b); 2015 Permit, Attachment H at 18.

of stormwater and authorized non-stormwater discharges from the facility. 1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. 1997 Permit, Section A(2); 2015 Permit, Section X(H). The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

82.     The SWPPP must include: a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutants control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

83.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to stormwater, and to reduce or prevent the discharge of polluted stormwater from industrial facilities. 1997 Permit, Section A(2); 2015 Permit, Section X.

84.     The Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. 1997 Permit, Section A(9); 2015 Permit, Section X(A)(9). The Storm Water Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review

and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP. 1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

85.     Section A(9)(d) of the 1997 Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Storm Water Permit. *Id*.

86.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness. 1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

**E.     The Storm Water Permit's Monitoring and Reporting Requirements**

87.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting plan ("M&RP") when industrial activities begin at a facility. 1997 Permit, Sections B(1)-(2) and E(3). The M&RP must have ensured that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit. *Id*. at Section B(2). The M&RP must have ensured that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id*.

88.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that stormwater and non-stormwater discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. 1997 Permit, Sections B(2)(a) and B(2)(b); 2015 Permit, Section XI.

89.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in stormwater discharges. *Id*., 1997 Permit

Section B(2)(c) and B(2)(d).

90.     The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit. 2015 Permit, Sections I(J) (Findings 55-56) and XI.

91.     Section B(2)(d) of the 1997 Permit and Section XI(A)(4) of the 2015 Permit require that the M&RP shall be revised as necessary to ensure compliance with the Storm Water Permit.

92.     Section B(4)(a) of the 1997 Permit and Section XI(A) of the 2015 Permit require dischargers to conduct monthly visual observations of stormwater discharges.

93.     Section B(4)(c) of the 1997 Permit and Section XI(A)(2) of the 2015 Permit requires dischargers to document the presence of any floating and suspended materials, O&G, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in stormwater discharges from the facility. Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting stormwater discharges. *See* 1997 Permit, Section B(4)(c); 2015 Permit, Section XI(A)(3). The Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility. 1997 Permit, Section B(4)(c); 2015 Permit, Section X(B)(1).

94.     The Storm Water Permit requires dischargers to visually observe and collect samples of stormwater discharges from all locations where stormwater is discharged. 1997 Permit, Sections B(5) and B(7); 2015 Permit Section XI(B)(4).

95.     Section B(5)(a) of the 1997 Permit requires dischargers to collect stormwater samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All stormwater discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

96.     Section B(5)(b) of the 1997 Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without stormwater discharge.

97.     Section B(5)(c)(i) of the 1997 Permit requires dischargers to analyze each sample for pH, specific conductance ("SC"), TSS, and TOC. A discharger may substitute analysis for O&G instead of TOC.

98.     Section B(5)(c)(ii) of the 1997 Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharged from the facility.

99.     Section B(5)(c)(iii) and Table D of the 1997 Permit, require facilities classified as Standard Industrial Classification ("SIC") code 5093, such as the Covey Auto Facility, to also analyze stormwater samples for iron ("Fe"), zinc ("Zn"), lead ("Pb"), aluminum ("Al"), chemical oxygen demand ("COD")  and copper ("Cu"). 1997 General Permit, Table D; 2015 General Permit Tables 1-2.

100.    Section B(14) of the 1997 Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

101.    Section B(15)(f) of the 1997 Permit requires that sampling and analysis be performed according to Section B of the 1997 Permit.

102.    Section XI(B)(1) of the 2015 Permit requires sampling if a precipitation event produces a discharge for at least one drainage area, and it is preceded by forty-eight (48) hours with no discharge from any drainage area ("Qualifying Storm Event" or "QSE").

103.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze stormwater samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

104.    Section XI(B)(6) of the 2015 Permit requires dischargers to analyze stormwater samples for TSS, O&G, pH, additional parameters identified by the discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source

assessment, additional applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved TMDLs, and additional parameters required by the Regional Water Board.

105.    Table 1 of the 2015 Permit requires Facilities under SIC code 5093, such as the Covey Auto Facility, to analyze stormwater samples for iron, aluminum, lead, COD, and zinc. 2015 General Permit Tables 1-2.

106.    Section XVI of the 2015 Permit requires dischargers to submit an annual report with a Compliance Checklist that indicates whether a Discharger complies with, and has addressed all applicable requirements of this General Permit, an explanation for any non-compliance of requirements within the reporting year, as indicated in the Compliance Checklist, an identification, including page numbers and/or Sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation.

## V.    STATEMENT OF FACTS

### A.    The Covey Auto Facility Site Description

107.    The Covey Auto Facility consists of maintenance and wash bays, fueling areas, hazardous materials and waste storage area, a separate waste oil storage area, a vehicle storage area, and an intermodal storage area, a dismantling and fluid evacuation area, and parking areas. The Covey Auto Facility also has an administrative office. The site covers approximately ten (10) acres with nine (9) acres exposed to storm water.  Pursuant to the Covey Auto Facility NOI, the industrial activities of the Facility fall under Standard Industrial Classification ("SIC") code 5093, Scrap and Waste Metals. This industrial code includes auto wreckers engaged in dismantling automobiles for scrap. The Covey Auto Facility's Level 2 Exceedance Response Action Plan, dated January 3, 2018, notes that three primary SIC codes apply at the site, and also includes SIC code 4213 Trucking, Except Local, and SIC code 7549 Automotive Services, Except Repair.

108.    Industrial operations and activities taking place at the Covey Auto Facility include but are not limited to: loading and unloading of vehicles related to transport or towing services, other vehicle transport activities, storage of impounded or towed vehicles, automobile and vehicle dismantling, cut down, with metals and other recyclables sold for scrap, vehicle maintenance and repair, vehicle oil and brake changes, other vehicle maintenance, vehicle fluid draining prior to further dismantling, other truck

1   and vehicle storage.

2       109.    Industrial materials and potential pollutants onsite include, but are not limited to, motor

3   oil and grease, used oil, antifreeze and used antifreeze, coolant, acid from lead acid batteries, diesel and

4   gasoline drained from tanks, brake fluids, power steering and transmission fluids, Freon, e-waste and

5   mercury-containing universal wastes such as high intensity lamp bulbs, aluminum from dismantling of

6   vehicles and other sources, metal shavings and metal dust, vehicle batteries, metals from stored vehicles,

7   metals and suspended solids from operating vehicles, suspended solids from roadways and windblown

8   sediment and dust, used coolant, and metals and chemicals from vehicle washing activities.

9       110.    The Covey Auto Facility collects and discharges polluted stormwater associated with

10  industrial activities pursuant to the General Permit primarily through a single main stormwater discharge

11  outfall for which is located on the north-west side of the Facility. Stormwater is purported to follow flow

12  patterns and enter a series of drain inlets and then passes through a sand/oil filter and is sampled prior to

13  discharging into the City of Stockton's Municipal Separate Storm Sewer System ("MS4") and then into

14  Yosemite Lake which is part of the Sacramento-San Joaquin Delta watershed, and directly connected to

15  the San Joaquin River less than three miles away via the Smith Canal. Upon information and belief,

16  there are other locations at the Covey Auto Facility discharging stormwater associated with industrial

17  activities, namely from borders and other runoff areas of the Covey Auto Facility. These discharges

18  eventually enter the MS4 system and are discharged to the Receiving Waters herein, including Calaveras

19  River.

20      111.    CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility's areas

21  described herein, lack adequate cover or secondary containment, and certain industrial activities occur

22  outside without adequate cover or secondary containment, resulting in discharges of polluted

23  stormwater. Vehicle and other traffic at the Covey Auto Facility track dust and particulate matter,

24  increasing the discharge of polluted water, sediments and debris into waters of the United States.

25      **B.    The San Joaquin River and the Sacramento San Joaquin River Delta**

26      112.    The Sacramento-San Joaquin Delta ("Delta") is California's most crucial water and

27  ecological resource. This expansive inland river delta and estuary in Northern California is formed at the

28  western edge of the Central Valley. The Delta is formed by the Sacramento River flowing south to meet

the north-flowing San Joaquin River just south of Sacramento, where the rivers mingle with smaller tributaries and tidal flows. There are many other source rivers and streams including the Calaveras and Mokelumne Rivers, tributaries to the San Joaquin River. CSPA hereby alleges that fugitive dust and stormwater from the Covey Auto Facility enter the Calaveras River.

113.    The San Joaquin River and the Delta are home over 500 plant and animal species including the critically endangered Delta Smelt, a species that has been listed as endangered under California Endangered Species Act since 2010. Including the Delta Smelt, the San Joaquin River and the Delta are home to approximately 55 species of fish, including several Pacific salmon species, striped bass, steelhead trout, American shad, sturgeon, perch, and lampreys. About two-thirds of California's salmon pass through the Delta on their way upstream to spawn. The lower course of the San Joaquin River has suffered a history of pollution. Municipal and industrial runoff, along with pesticides and fertilizers have led to elevated levels of selenium, fluoride, nitrates and other substances in the river and its tributaries. In part due this pollution, there are many other threatened species and species of concern living in and around the San Joaquin River and the Delta.

### D.    The Covey Auto Facility's Storm Water Permit Coverage

114.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Covey Auto Facility submitted an NOI for coverage under the 1997 Permit.

115.    CSPA is not currently in possession of any SWPPP's submitted prior to 2015, to cover the Covey Auto Facility, but CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Covey Auto Facility, submitted an NOI for coverage under the 1997 Permit. Further information about coverage under the 1997 permit will be sought in discovery.

116.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Covey Auto Facility recently submitted an NOI for their industrial operations on or about May 27, 2015, for coverage for the Covey Auto Facility under the 2015 Permit.

117.    The State Board's electronic database, called the Storm Water Multiple Application & Report Tracking System ("SMARTS"), lists the current Covey Auto Facility Waste Discharge Identification ("WDID") number as 5S39I023338. SMARTS lists the Covey Auto Facility's coverage under the Storm Water Permit as "Active."  The NOI for the Covey Auto Facility identify the receiving

1   water for discharges and runoff from the Covey Auto Facility to be Yosemite Lake, which is

2   hydrologically connected to the San Joaquin River Creek.

3       118.   Via search of the SMARTS database, CSPA obtained SWPPPs for the Covey Auto

4   Facility dated June 15, 2015, and an updated SWPPP for the Covey Auto Facility dated December 22,

5   2016 ("Covey Auto Facility SWPPP").

6       119.   CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility

7   SWPPP fails to describe and/or adequately describe all of the Covey Auto Facility's industrial activities

8   or processes.

9       120.   CSPA is informed and believes, and thereon alleges, that because the Covey Auto

10   Facility's SWPPP fails to describe and/or adequately describe all of the Covey Auto Facility's industrial

11   activities, the Covey Auto Facility's SWPPP also fails to describe and/or adequately describe all of the

12   significant materials and processes that are related to the Covey Auto Facility's industrial activities.

13       121.   CSPA is informed and believes, and thereon alleges, that pollutants associated with the

14   Covey Auto Facility include, but are not limited to: pH-affecting substances; metals, such as iron and

15   aluminum; toxic metals, such as lead, zinc, cadmium, chromium, copper, and mercury; chemical oxygen

16   demand ("COD"); TSS; gasoline and diesel fuels; fugitive metal particulates, and other dust and dirt;

17   and O&G.

18       122.   CSPA is informed and believes, and thereon alleges, that without properly identifying all

19   industrial activities or all significant materials at the Covey Auto Facility in the SWPPP, the

20   Owners/Operators have not developed and/or implemented all appropriate BMPs.

21       123.   CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility's

22   SWPPP includes no assessments and/or no adequate assessments of potential pollutant sources, the

23   associated pollutants, and the corresponding BMPs at the Covey Auto Facility.

24       124.   CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility's

25   SWPPP includes no description and/or no adequate description of the Covey Auto Facility's BMPs,

26   analyses of the effectiveness of the BMPs, or summaries of the BMPs by pollutant source.

27       125.   CSPA is informed and believes, and thereon alleges, that the Owners/Operators have

28   failed and continue to fail to develop the Covey Auto Facility's SWPPP and site-specific BMPs

consistent with Section A of the 1997 Permit, and Section X of the 2015 Permit.

126.     CSPA is informed and believes, and thereon alleges, that Defendant's SWPPP fails and continues to fail to include an adequate: (1) list of significant materials handled and stored at the site; (2) description of potential pollutant sources including industrial processes, material handling and stockpiling areas, dust and particulate generating activities; (3) description of significant spills and leaks; or (4) list of all non-stormwater discharges and their sources; Section A of the 1997 Permit and Section X of the 2015 Permit.

127.     CSPA is informed and believes, and thereon alleges, that stormwater sampling at the Covey Auto Facility demonstrate that the Covey Auto Facility's stormwater discharges contain concentrations of pollutants above the Benchmark Levels, including but not limited to copper, aluminum, iron, zinc, COD, and TSS.

128.     CSPA is informed and believes, and thereon alleges, that the repeated and significant exceedances of Benchmark Levels demonstrate that the Covey Auto Facility's Owners/Operators have failed and continue to fail to develop and/or implement BMPs to prevent the exposure of pollutants to stormwater and to prevent discharges of polluted stormwater and non-stormwater from the Covey Auto Facility.

129.     CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility Owners/Operators have failed and continue to fail to adequately revise the SWPPP, despite repeated and significant concentrations of pollutants in the Covey Auto Facility's stormwater discharges, make changes to the Covey Auto Facility's training programs, or make any other changes based upon events that would signal a need for required revisions or alteration of practices.

130.     CSPA is informed and believes, and thereon alleges, that some of the Covey Auto Facility's industrial operations are conducted outdoors without secondary containment or other measures to prevent polluted stormwater from discharging from the Covey Auto Facility.

131.     CSPA is informed and believes, and thereon alleges, that pollutants, including but not limited to those referenced herein, have been and continue to be tracked throughout the Covey Auto Facility's operation areas and offsite.

132.    CSPA is informed and believes, and thereon alleges, that these pollutants are deposited into water bodies, and onto streets and/or into storm drains near to the Covey Auto Facility via fugitive dust and other means, including but not limited to dust generated by wind, equipment and vehicles.

133.    CSPA is informed and believes, and thereon alleges, that trucks and vehicles leaving the Covey Auto Facility via staging areas and driveways are pollutant sources tracking sediment, dirt, oil and grease, metal particulates, and other pollutants off-site.

134.    CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility Owners' and/or Operators' failure to properly address pollutant sources and pollutants results in the exposure of pollutants associated with their industrial activities to precipitation, and that this results in discharges of polluted stormwater from the Covey Auto Facility and into local waterways in violation of the Storm Water Permit and/or the Clean Water Act.

135.    CSPA is informed and believes, and thereon alleges, that BAT/BCT for the Covey Auto Facility is full enclosure of all uncovered inoperable vehicles, crushed and dismantled vehicles, any bulk material stockpiles, stored vehicles, and industrial operations that cause the spread and release of pollutants, and cleanup of any scrap metals, broken down vehicles, automotive and other fluids, waste materials, and unused, broken, or legacy equipment at the Covey Auto Facility.

136.    CSPA is informed and believes, and thereon alleges, that Defendant has failed to achieve compliance with BAT/BCT requirements by failing to fully enclose industrial areas containing cut down vehicles, waste materials, fluids, unused, broken or legacy equipment, that cause the spread and release of pollutants.

137.    CSPA is informed and believes, and thereon alleges, that the Covey Auto Facility Owners/Operators' failure to properly address these pollutants and their sources results in the exposure of pollutants to precipitation, which carries these pollutants with stormwater flows from the Covey Auto Facility into the Receiving Waters herein.

138.    CSPA is informed and believes, and thereon alleges, that Defendant's failure to properly address these pollutants and their sources results in the discharge of fugitive dust, including but not limited to dust generated by industrial operations, wind, equipment, and vehicles, which carries these pollutants to off-site waterbodies, and to off-site properties, streets and storm drains adjacent to the

1   Covey Auto Facility. Pollutants deposited off-site eventually flow into the Receiving Waters herein.

2        139.    CSPA is informed and believes, and thereon alleges, that Defendant will purport to meet

3   the NEC "checklist" requirements set out at Section XVII.A.I and Appendix 2 of the 2015 Permit.

4        140.    CSPA is informed and believes, and thereon alleges, that the Defendant has provided no

5   evidence of an evaluation of the industrial portions of the Covey Auto Facility that discharges to any

6   outfall would support a conclusion that industrial materials or activities in that area are not exposed to

7   precipitation.

8        141.    CSPA is informed and believes, and thereon alleges, that pollutants associated with

9   industrial activity are present in each of the drainage areas of the Covey Auto Facility.

10        142.    CSPA is informed and believes, and thereon alleges, that pollutants associated with

11   industrial activity has, and continues to, discharge from drainage areas of the Covey Auto Facility.

12        143.    CSPA is informed and believes, and thereon alleges, that Defendant has provided only

13   scant evidence that industrial operations under certain applicable SIC codes have ceased at the Covey

14   Auto Facility and has provided no evidence that pollutants caused by those activities, including but not

15   limited to, metal shaving and particulates from auto dismantling and storage activities, have been

16   effectively eliminated.

17        144.    During the 60-day Notice Letter period, CSPA was not contacted by Defendant. On the

18   sixtieth (60th) day following issuance of the Notice Letter, counsel for Defendant notified CSPA that

19   Defendant was in the process of ceasing certain industrial activities at the Covey Auto Facility, and that

20   all materials associated with those activities were removed, and that Defendant would file a Notice of

21   Termination ("NOT") with the State Board and Regional Boards to cease coverage under the 2015

22   Permit.

23        145.    On the sixty-first (61st) day following issuance of the Notice Letter, counsel for

24   Defendant notified CSPA that Defendant had reversed course and would now file a No Exposure

25   Certification ("NEC") with the State and Regional Boards, rather than a Notice of Termination. With

26   that correspondence, counsel for Defendant provided a letter from Defendant to the Department of

27   Motor Vehicles dated March 13, 2018 stating that Defendant has ceased all activities related to auto

28   dismantling and surrenders its license for same effective immediately. A Department of Motor Vehicles

1    "Out-of-Business Report" was also attached.  Counsel was subsequently unavailable to discuss

2    telephonically on the 61st day of the Notice Letter Period.

3         146.   CSPA is informed and believes, and thereon alleges, that current contamination resulting

4    from historic industrial practices at the Covey Auto Facility represents a condition of exposure to

5    industrial activity and stormwater or stormwater runoff and thus the Covey Auto Facility is not eligible

6    for NEC coverage.

7         147.   CSPA is informed and believes, and thereon alleges, that Defendant must adhere to the

8    2015 Permit guidelines to comply with ERA Level 2, prior to a return to baseline status under the 2015

9    Permit, in order to become eligible for the reduced 2015 Permit requirements for NEC coverage under

10   the 2015 Permit. This includes submitting the requisite number of stormwater samples for all parameters

11   for which the Covey Auto Facility is required to sample under its current SIC codes, and that those

12   samples meet the NAL Benchmarks for those same parameters during the 2017-2018 reporting year.

13        148.   CSPA is informed and believes, and thereon alleges, that Defendant has not submitted

14   any materials supporting any of the conclusions made by counsel, or supporting any of the information

15   submitted to the Department of Motor Vehicles, to the State Board or SMARTS.

16        **E.    Stormwater Discharges at the Covey Auto Facility**

17        149.   The Covey Auto Facility Owners/Operators Covey Auto's SWPPP identifies a single

18   discharge point at the Facility at an outfall located in the northwest part of the Facility. The SWPPP

19   describes the Covey Auto Facility as having as many as ten (10) drain inlets throughout the site to

20   prevent fugitive discharge. Accordingly, there are a least stormwater discharge locations. In the event

21   that the Covey Auto Facility did discharge stormwater from site runoff not collected by or directed to a

22   drain inlet, that runoff would discharge into the Calaveras River. The Covey Auto facility grading is

23   claimed to channel most if not all storm water through a storm drain located north of the main building,

24   Outfall 1. Despite discharging from multiple industrial areas at the Covey Auto Facility, Outfall 1 is

25   claimed to be representative of the quantity and quality of the storm water discharging from the Covey

26   Auto Facility and thus storm water discharge is only collected and sampled from Outfall 1.

27        150.   According to the Covey Auto Facility SWPPP Map, Outfall 1 is located in the Employee

28   parking area, and CSPA thereon alleges, that Outfall is not representative quality of the storm water

discharging from the Covey Auto Facility. The other nine (9) drainage inlet outfalls are located throughout the site where vehicles are stored, loaded, where vehicles are dismantled with a torch (Outfall 9) and near to the fueling and fuel storage areas, maintenance bays, hazardous waste storage areas, and wash bays.

**F.      The Covey Auto Facility's Stormwater Discharges to the Receiving Waters Contain Elevated Levels of Pollutants**

151.    CSPA is informed and believes, and thereon alleges, that pollutants from the Covey Auto Facility discharge from multiple discharge points and into Yosemite Lake, the Calaveras River, the Smith Canal, the San Joaquin River and the Delta.

152.    The EPA promulgated regulations for the Section 402 NPDES permit program defining waters of the United States. *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and other waters including intermittent streams that could affect interstate commerce. The CWA requires any person who discharges or proposes to discharge pollutants into waters of the United States to submit an NPDES permit application. 40 C.F.R. § 122.21.

153.    CSPA is informed and believes, and thereon alleges, that Yosemite Lake, the Calaveras River, the Smith Canal, the San Joaquin River and the Delta, the Receiving Waters herein, are waters of the United States, and/or a tributary to a traditionally navigable water.

154.    CSPA is informed and believes, and thereon alleges, that polluted stormwater and non-stormwater discharges from the Covey Auto Facility to the Receiving Waters.

155.    Stormwater discharges containing pollutants, including but not limited to, heavy metals such as zinc, aluminum, and iron adversely affect the aquatic environment.

156.    Samples of stormwater discharges collected at the Covey Auto Facility contain pollutants including zinc, iron, aluminum, TSS, copper, COD and pH affecting substances in excess of levels known to adversely impact aquatic species and the environment, federal regulations, WQS, EPA Benchmarks, and the CTR in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

157.    CSPA is informed and believes, based upon Annual Reports and Monitoring Reports obtained from the Regional Board following service of the Notice Letter herein, that the Covey Auto Facility reported multiple effluent exceedances from the 2011-2012, 2013-2014, 2014-2015, 2015-2016, and 2016-2017 reporting years, including but not limited to, exceedances of TSS, aluminum, iron, TSS, copper, COD and zinc. There were no stormwater samples analyzed and reported to SMARTS in either 2013 or 2017. No stormwater samples have been analyzed and reported to SMARTS in 2018.

158.    CSPA is informed and believes, and thereon alleges, that during and/or after every significant rain event[6] or any other stormwater or non-stormwater discharge that has occurred at the Covey Auto Facility since January 11, 2013 through the present, Defendant has discharged and continues to discharge stormwater and non-stormwater from the Covey Auto Facility that contains concentrations of pollutants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit, the Federal Effluent Limitations, the EPA Benchmarks, CTR, and the WQS.

**G.      Defendant's Failure to Comply with the Storm Water Permit's Sampling, Reporting, and Monitoring Requirements**

159.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to develop an adequate M&RP for industrial operations at the Covey Auto Facility that complies with Section B of the 1997 Permit, and Section XI of the 2105 Permit.

160.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to revise the M&RP for the Covey Auto Facility as necessary to ensure compliance with the 1997 Permit, in violation of Section B(2)(d), and Section XI of the 2105 Permit.

161.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to collect samples during the first hour of the first storm event of the Wet Season over the past five years, in violation of Section B(5)(a) of the 1997 Permit and Section XI(B) of the 2015 Permit.

162.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to analyze stormwater samples collected at the Covey Auto Facility for all toxic chemicals and other pollutants likely to be present in significant quantities in the stormwater discharges,

---

[6] A significant rain event is an event that produces stormwater runoff, which according to EPA occurs with more than 0.1 inches of precipitation.

in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

163.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to demonstrate that stormwater sampling limited to those listed in the Covey Auto Facility's 2016 SWPPP, are representative of pollutants from the Covey Auto Facility, in violation of Section B(5) of the 1997 Permit and Section XI(B) of the 2015 Permit.

164.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to sample stormwater discharges from all discharge locations, in violation of Section B(7) of the 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

165.    CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to adequately revise the M&RP for the Covey Auto Facility as necessary to ensure compliance with the Storm Water Permit in violation of Sections A(9) and A(10) of 1997 Permit and Sections XI(B) and XI(C) of the 2015 Permit.

166.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Covey Auto Facility consistently fail to perform visual observations of stormwater during QSEs.

167.    CSPA is informed and believes, and thereon alleges, that the Owners/Operators of the Covey Auto Facility have consistently failed and continue to fail to report any noncompliance with the Storm Water Permit at the time that the Annual Report is submitted, including: 1) a description of the noncompliance and its cause, 2) the period of noncompliance, 3) if the noncompliance has not been corrected, the anticipated time it is expected to continue, and 4) steps taken or planned to reduce and prevent recurrence of the noncompliance as required by the 1997 Permit, Section C(11)(d).

168.    CSPA is informed and believes, and thereon alleges, that Defendant's certifications of compliance with the 1997 Permit in each of its past five (5) Annual Reports, provided the Annual Reports were in fact submitted, were erroneous because Defendant has not developed and/or implemented the required BMPs, or revised the SWPPP or the M&RP, as required by Sections A and B of the 1997 Permit. A revised SWPPP has not been submitted to SMARTS following the Level 2 Exceedance Response Action Plan submitted by the Covey Auto Facility.

169.    CSPA is informed and believes, and thereon alleges, that Defendant has failed to submit complete Annual Reports to the Regional Board in violation of Section B(14) of the 1997 Permit.

## VI.  CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Discharges of Contaminated Stormwater in Violation of
the Storm Water Permit's Effluent Limitations and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

170.   CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

171.   CSPA is informed and believes, and thereon alleges, that Defendant has failed and continues to fail to reduce or prevent pollutants associated with industrial activities at the Covey Auto Facility from stormwater discharges from the Covey Auto Facility through implementation of BMPs that achieve BAT/BCT.

172.   CSPA is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Covey Auto Facility occur every time stormwater discharges from the Covey Auto Facility. Defendant's failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Covey Auto Facility is a violation of the Storm Water Permit and the CWA. *See* 1997 Permit, Effluent Limitation B(3); 2015 Permit, Section I(D) (Finding 32), Effluent Limitation V(A); 33 U.S.C. § 1311(b).

173.   The Owners/Operators and Defendant violate and will continue to violate the Storm Water Permit's Effluent Limitations each and every time stormwater containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Covey Auto Facility.

174.   CSPA is informed and believes, and thereon alleges, that Defendant's violations of Effluent Limitations of the Storm Water Permit and the Clean Water Act are ongoing and continuous.

175.   Each day since at least January 11, 2013 that Defendant and the Owners/Operators discharge stormwater containing pollutants in violation of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

176.   By committing the acts and omissions alleged above, the Defendant is subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 11, 2013

to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

177.    An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiffs and the citizens of the State of California, for which harm CSPA has no plain, speedy, or adequate remedy at law.

178.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## SECOND CAUSE OF ACTION
### Defendant's Discharges of Contaminated Stormwater in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act. 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

179.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

180.    CSPA is informed and believes, and thereon alleges, that discharges of stormwater containing levels of pollutants that adversely impact human health and/or the environment from the Covey Auto Facility occur each time stormwater discharges from the Covey Auto Facility.

181.    CSPA is informed and believes, and thereon alleges, that stormwater containing levels of pollutants that cause or contribute to exceedances of water quality standards has discharged and continues to discharge from the Covey Auto Facility each time stormwater discharges from the Covey Auto Facility.

182.    The Defendant and its Owners/Operators violate and will continue to violate the Storm Water Permit's Receiving Water Limitations each and every time stormwater containing levels of pollutants that adversely impact human health and/or the environment, and that cause or contribute to exceedances of WQS, discharges from the Covey Auto Facility.

183.    CSPA is informed and believes, and thereon alleges, that the Defendant's Owners' and/or Operators' violations of Receiving Water Limitations of the Storm Water Permit and the CWA are ongoing and continuous.

184.    Each and every violation of the Storm Water Permits' Receiving Water Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

185.    By committing the acts and omissions alleged above, Defendant and the Covey Auto Facility Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 11, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

186.    An action for injunctive relief under the Clean Water Act is authorized by Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, Plaintiff's members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

187.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### THIRD CAUSE OF ACTION
**Defendant's Discharges of Non-Stormwater in Violation
of the Storm Water and the Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

188.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

189.    CSPA is informed and believes, and thereon alleges, that prohibited non-stormwater discharges have discharged and continue to discharge from the Facilities, in violation of the Storm Water Permit and/or CWA Section 301(a), 33 U.S.C. § 1311(a).

190.    CSPA is informed and believes, and thereon alleges, that Defendant and the Owners' and/or Operators' violations of Discharge Prohibitions of the Storm Water Permit are ongoing and continuous.

191.    Each and every violation of the Storm Water Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

192.    By committing the acts and omissions alleged above, the Defendant and the Covey Auto Facility Owners/Operators are subject to an assessment of civil penalties for each and every violation of

1  the CWA occurring from January 11, 2013 to the present, pursuant to Sections 309(d) and 505 of the

2  CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

3      193.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a).

4  Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, its

5  members, and the citizens of the State of California, for which harm they have no plain, speedy, or

6  adequate remedy at law.

7      194.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual

8  controversy exists as to the rights and other legal relations of the Parties.

9      WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Adequately Develop, Implement, and/or**
**Revise a Storm Water Pollutant Prevention Plan in Violation of the**
**Storm Water Permit and the Clean Water Act.**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

13     195.    CSPA incorporates the allegations contained in the above paragraphs as though fully set

14  forth herein.

15     196.    CSPA is informed and believes, and thereon alleges, that Defendant and the

16  Owners/Operators have failed and continue to fail to develop adequate SWPPPs for the Covey Auto

17  Facility, in violation of the Storm Water Permit.

18     197.    CSPA is informed and believes, and thereon alleges, that Defendant and the

19  Owners/Operators have failed and continue to fail to adequately implement SWPPPs for the Covey Auto

20  Facility, in violation of the Storm Water Permit.

21     198.    CSPA is informed and believes, and thereon alleges, that Defendant and the

22  Owners/Operators have failed and continue to fail to adequately revise the SWPPP for the Covey Auto

23  Facility, in violation of the Storm Water Permit.

24     199.    The Owners/Operators have been in violation of the Storm Water Permit at the Covey

25  Auto Facility every day from January 11, 2013 to the present.

26     200.    Defendant's and the Owners' and/or Operators' violations of the Storm Water Permit and

27  the CWA at the Covey Auto Facility are ongoing and continuous.

201.    Defendant and the Owners/Operators will continue to be in violation of the Storm Water Permit and the CWA each and every day Defendant and the Owners/Operators fail to adequately develop, implement, and/or revise the SWPPP for the Covey Auto Facility.

202.    Each and every violation of the Storm Water Permit's SWPPP requirements at the Covey Auto Facility is a separate and distinct violation of the CWA.

203.    By committing the acts and omissions alleged above, Defendant and the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 11, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

204.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

205.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Adequately Develop, Implement, and/or
Revise a Monitoring and Reporting Plan in Violation of
the Storm Water Permit and the Clean Water Act.
U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

206.    CSPA incorporates the allegations contained in the above paragraphs as though fully set forth herein.

207.    CSPA is informed and believes, and thereon alleges, that Defendant and the Owners/Operators have failed and continue to fail to develop an adequate M&RP for the Covey Auto Facility, in violation of the Storm Water Permit.

208.    CSPA is informed and believes, and thereon alleges, that Defendant and the Owners/Operators have failed and continue to fail to adequately implement an M&RP for the Covey Auto Facility, in violation of the Storm Water Permit.

209.    CSPA is informed and believes, and thereon alleges, that Defendant and the Owners/Operators have failed and continue to fail to adequately revise an M&RP for the Covey Auto Facility, in violation of the Storm Water Permit.

210.    Defendant and the Owners/Operators have been in violation of the Storm Water Permit's monitoring requirements at the Covey Auto Facility every day from January 11, 2013 to the present.

211.    Defendant's and the Owners' and/or Operators' violations of their Storm Water Permit's monitoring requirements and the CWA at the Covey Auto Facility are ongoing and continuous.

212.    Defendant and the Owners/Operators will continue to be in violation of Section B and Provision E(3) the 1997 Permit, Section XI of the 2015 Permit, and the CWA each and every day they fail to adequately develop, implement, and/or revise an M&RP for the Facilities.

213.    Each and every violation of the Storm Water Permit's M&RP requirements at the Covey Auto Facility is a separate and distinct violation of the CWA.

214.    By committing the acts and omissions alleged above, Defendant and the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 11, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

215.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

216.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

### SIXTH CAUSE OF ACTION
**Defendant's Failure to Report as Required by the Storm Water
Permit in Violation of the Storm Water Permit and the
Clean Water Act.
33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

217.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully

set forth herein.

218.   Receiving Water Limitation C(3) of the 1997 Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to current BMPs in order to prevent or reduce any pollutant in stormwater discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, those BMPs must be implemented into a Facility's SWPPP.

219.   Receiving Water Limitation C(4)(a) of the 1997 Permit requires the report to be submitted to the Regional Board no later than 60-days from the date the discharger first learns its discharge is causing or contributing to an exceedance of an applicable water quality standard. Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.

220.   CSPA is informed and believes, and thereon alleges, that Defendant and the Owners/Operators have failed and continue to fail to submit accurate Annual Reports to the Regional Board, in violation of Sections B(14), C(9), and C(10) of the 1997 Permit.

221.   CSPA is informed and believes, and thereon alleges, that Defendant's and the Owners' and/or Operators' Annual Reports for the Covey Auto Facility failed and continue to fail to meet the monitoring and reporting requirements of the Storm Water Permit, in violation of Section B(14) of the 1997 Permit.

222.   CSPA is informed and believes, and thereon alleges, that Defendant and the Owners/Operators have failed and continue to fail to submit complete Annual Reports for the Covey Auto Facility to the Regional Board, in violation of Sections B(14), C(9), C(10) and C(11) of the 1997 Permit.

223.   Defendant and the Owners/Operators have been in violation of Sections B(14), C(9), C(10), and/or C(11) of the 1997 Permit and CWA every day since at least January 11, 2013.

224.   Defendant and the Owners/Operators have been in violation of the reporting requirements of the Storm Water Permit each day it has operated the Covey Auto Facility without reporting as required by Receiving Water Limitations C(3) and C(4) of the 1997 Permit.

225.   Defendant and the Owners/Operators have been in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit every day since at least January 11, 2013.

226.    Defendant's and the Owners' and/or Operators' violations of the reporting requirements of the Storm Water Permit and the CWA are ongoing and continuous.

227.    By committing the acts and omissions alleged above, Defendant and the Owners/Operators are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 11, 2013 to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

228.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm CSPA, its members, and the citizens of the State of California, for which harm they have no plain, speedy, or adequate remedy at law.

229.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth hereafter.

## VII.    <u>RELIEF REQUESTED</u>

230.    Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    A Court order declaring Defendant to have violated and to be in violation of Sections 301(a) and (b) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b); for its unlawful discharges of pollutants from the Covey Auto Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent benchmarks, standards, or limitations which include BAT/BCT requirements, and for failing to comply with the substantive and procedural requirements of the Storm Water Permit and the CWA.

b.    A Court order enjoining Defendant from violating the substantive and procedural requirements of the Storm Water Permit and Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a), 1342;

c.    A Court order assessing civil monetary penalties for each violation of the CWA occurring prior to November 2, 2015 at $37,500 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2009);

d.    A Court order assessing civil monetary penalties for each violation of the CWA

occurring on or after November 2, 2015 at $51,750 per day per violation, as permitted by 33 U.S.C. § 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (2016);

   e.  A Court order awarding Plaintiff its reasonable costs of suit, including attorney, witness, expert, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

   f.  Any other relief as this Court may deem appropriate.

Dated: March 13, 2018       Respectfully submitted,

           _____

           Anthony M. Barnes
           AQUA TERRA AERIS LAW GROUP
           Attorneys for Plaintiff
           CALIFORNIA SPORTFISHING PROTECTION
           ALLIANCE